UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LEVELAND BROWN, | : | |
|     Plaintiff, | : | |
| | : | |
| V. | : | C.A. No. _____ |
| | : | |
| WEST WARWICK HOUSING AUTHORITY, | : | |
| CINDY WHITE OVERTON, individually and in her | : | |
| capacity as partner of D&V/MainSail; RICHARD | : | |
| LECO, individually and in his capacity as partner of | : | |
| D&V/MainSail; and KATIE FAGAN, | : | **Jury Trial Demanded** |
|     Defendants. | : | |

## VERIFIED COMPLAINT

1.   In this action, the Plaintiff, Leveland Brown, seeks declaratory relief, injunctive relief, and

damages for the Defendants' unlawful decision to terminate the Plaintiff's Section 8 Housing

Choice Voucher (hereinafter "Section 8 Voucher"). The Defendant is a black male who was

discriminated against and wrongfully terminated from the Section 8 Voucher program for the

stated reason of failure to timely report income from a food truck business, when it is

undisputed that the food truck business was and is operating at a substantial loss and thus, the

Plaintiff earned no income to report. The termination of the Plaintiff's Section 8 Voucher

followed Plaintiff's relinquishing his voucher after the Defendants threatened him with

criminal prosecution. The Plaintiff subsequently rescinded the relinquishment of his voucher

and requested a hearing to challenge Defendants' actions. The Defendants' termination of the

Plaintiff's Section 8 Voucher not only violates federal regulations governing the Housing

Choice Voucher Program ("HCVP"), but Defendants also failed to follow West Warwick

Housing Authority's Administrative Plan. Moreover, Defendants resorted to unlawful racial

discrimination, defamation, and extortion to deprive the Plaintiff of his Section 8 Voucher, a

1

constitutionally protected property interest, and deprived the Plaintiff of his right to participate in a federally subsidized housing program free from racial discrimination.

## JURISDICTION AND VENUE

2.  This Court has jurisdiction over this action and all Defendants pursuant to 28 U.S.C. § 1331, because this case arises under the Constitution and laws of the United States.

3.  This Court also has jurisdiction over this action and all Defendants pursuant to 28 U.S.C. § 1343(a)(3), because the Plaintiff seeks to redress the deprivation of his Section 8 Voucher, under the color of State law, which, deprived the Plaintiff of his equal rights under the law.

4.  This Court has supplemental jurisdiction over the Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

5.  The principal events giving rise to the claims stated herein occurred in this district and venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(c)(1), (2).

6.  This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. Rule 57.

## PARTIES

7.  The Plaintiff, Leveland Brown, is a disabled black male citizen of the United States who resides in West Warwick, Rhode Island.

8.  The Defendant, West Warwick Housing Authority ("WWHA") is a public housing agency ("PHA"), created pursuant to R.I.G.L. § 45-26-1 *et seq.* for the purpose, *inter alia*, of providing safe and sanitary affordable housing opportunities for lower income families. At all material times WWHA was acting under color of state law.

9.  The Defendant, Cindy White Overton (hereinafter "Overton"), is a white female citizen of the United States and a resident of Rhode Island.

10. The Defendant, Richard Leco (hereinafter "Leco"), is a white male citizen of the United States and a resident of Massachusetts.

11. Defendants Overton and Leco formed a joint venture or partnership, D&V/MainSail, which holds itself out as an expert in public and subsidized housing programs, including the Section 8 Housing Choice Voucher Program, which is described in more detail below. D&V/MainSail provides training for public housing agencies, inspects apartments, investigates tenants, conducts searches for executive directors, and acts as hearing officers for many PHAs throughout Rhode Island, Massachusetts, and Connecticut. Overton and Leco are commissioners of PHAs and members of the National Association of Housing Redevelopment Agencies from which they market their services to and influence many PHAs.

12. In or about November, 2014, D&V/MainSail became the Acting Executive Director of WWHA, and appointed the Defendant, Katie Fagan (hereinafter "Fagan"), as its representative to that position. At all material times, D&V/MainSail and its partners (Defendants Overton and Leco) acted under color of state law.

13. The Defendant Fagan is a citizen of the United States and a resident of Rhode Island. At all material times as D&V/MainSail's representative to the position of Executive Director of WWHA, Fagan acted under color of state law.

## GENERAL ALLEGATIONS

*The Housing Choice Voucher Program & Rules for Terminating Voucher Recipients*

14.   The Housing and Community Development Act of 1974, 42 U.S.C. § 1437f, amended the United States Housing Act, 42 U.S.C. § 1437 *et seq*., and created the Section 8 Housing Choice Voucher Program (hereafter, "HCVP").

15.   Under the HCVP, qualifying lower income families and individuals receive a rental subsidy (hereinafter "Section 8 Voucher") that is used to pay a portion of the rent with funds from HUD to the voucher recipient's landlord each month. 42 U.S.C. § 1437f (o).

16.   The rental subsidy payments are administered by local public housing agencies (hereinafter "PHA"), established under state law and designated by HUD to administer the program in a particular geographic area. 42 U.S.C. §1437f(o)(1)(A); R.I.G.L. § 45-25-1 *et seq.*

17.   Under the HCVP, the Section 8 Voucher recipient pays 30% of the household's adjusted income for rent and utilities, and with funds from HUD, the PHA pays the remainder of the rent directly to the landlord on the Section 8 Voucher recipient's behalf, subject to the maximum rent limitations proscribed by HUD. 42 U.S.C. § 1437f(o)(2)(A).

18.   In administering the HCVP, PHAs must act in accordance with HUD regulations and directives. See 42 U.S.C. § 1437f (o) (1-19) (defining specific statutory obligations of PHAs in administering the HCVP.); 24 C.F.R. § 982.52(a) ("The PHA must comply with HUD regulations and other HUD requirements for the program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives").

19.   The Defendant WWHA is a PHA created pursuant to R.I.G.L. § 45-26-1 *et seq*. for the purpose, *inter alia*, of providing safe and sanitary affordable housing opportunities for lower income families.

20. The WWHA administers the HCVP in the city of West Warwick, Rhode Island.

21. HUD requires each PHA to adopt a written administrative plan that is consistent with HUD regulations, and the PHA must administer its HCVP in accordance with the PHA's administrative plan. 24 C.F.R. § 982.54.

22. The PHA's administrative plan may include reasonable policies that impose responsibilities on a Section 8 Voucher recipient and that allow for the termination of a Section 8 Voucher upon the recipient's failure to comply with those responsibilities. 24 C.F.R. § 982.54. A PHA may only terminate a Section 8 Voucher in accordance with the procedures in its administrative plan and on ground set forth in HUD regulations.

23. In accordance with HUD regulations, the WWHA promulgated an administrative plan (hereinafter "WWHA Admin Plan"), which contains, among other things, requirements for recipients of Section 8 Vouchers and procedures for termination of Section 8 Vouchers.

24. In accordance with HUD Regulation, 24 C.F.R. 982.516 (a), the WWHA Admin Plan contains procedures for conducting an annual examination of a voucher recipient's income to calculate the recipient's portion of the rent. Generally, the voucher recipient is required to pay 30% of his or her adjusted annual income for rent and an allowance for utilities. See WWHA Admin Plan, Chapter 5; 24 C.F.R. §§ 5.609, 5.610, 5.628, 5.634.

25. In between annual examinations of a voucher recipient's income, if a voucher recipient's income increases or decreases, HUD Regulations permit a PHA to perform an interim reexamination of income and change the recipient's portion of the rent. See 24 C.F.R. § 982.516 (b).

26. The WWHA Admin Plan generally requires voucher recipients to report "all increases in earned income, including new employment, within 10 business days of the date the change takes effect...." See WWHA Admin Plan page 11-9.

27. However, according to the WWHA Admin Plan, if a voucher recipient reports an increase in income, the only action the WWHA will take is to "note the information in the tenant file, but [] not conduct an interim reexamination" or increase the recipient's portion of the rent. See WWHA Admin Plan page 11-9.

28. If a voucher recipient is a person with disabilities who was previously unemployed, and the recipient starts to earn income, the PHA must not include any portion of the recipient's income for the first twelve months of the employment, under the "Self-Sufficiency Incentive" program. See 24 C.F.R. § 5.617.

29. The WWHA also adopted a specific policy regarding the income reporting requirements for persons who are business owners or self-employed persons. "If a family member has been self-employed less than three (3) months," the WWHA Admin Plan requires the WWHA to "accept the family member's certified estimate of income and schedule an interim reexamination in three (3) months. If the family member has been self-employed for three (3) to twelve (12) months the WWHA will require the family to provide documentation of income and expenses for this period and use that information to project income." See WWHA Admin Plan page 7-16 to 7-17.

30. The WWHA Admin Plan defines "income" as including "the net income from the operation of a business or profession." WWHA Admin Plan page 6-12 (emphasis added). The WWHA Admin Plan's definition of income is directly quoted from HUD Regulations that govern the HCVP. See 24 C.F.R. 5.609 (b)(2) ("Annual income

includes, but is not limited to: … The net income from the operation of a business or profession. Expenditures for business expansion or amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for depreciation of assets used in a business or profession may be deducted, based on straight line depreciation, as provided in Internal Revenue Service regulations. Any withdrawal of cash or assets from the operation of a business or profession will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested in the operation by the family.")

31. The WWHA Admin Plan also states that "If the net income from a business is negative, no business income will be included in annual income…" WWHA Admin Plan page 6-13.

32. The WWHA Admin Plan includes procedures for investigating a failure to report income. If the WWHA suspects a voucher recipient has not reported an increase in income, the WWHA may conduct an interim reexamination to investigate the recipient's income. See WWHA Admin Plan at page 11-9.

33. According to the WWHA Admin Plan, the WWHA initiates an interim reexamination by sending a written notice to the voucher recipient requesting documentation concerning the recipient's income. See WWHA Admin Plan at page 11-10.

34. According to the WWHA Admin Plan, if the interim reexamination results in a finding that the voucher recipient failed to report income as required, the voucher recipient's portion of the rent will increase, and the increase will be applied "retroactively, to the date it would have been effective had the information been provided on a timely basis. The [recipient] will be responsible for any overpaid subsidy and may be offered a

repayment agreement in accordance with the policies in Chapter 16." See WWHA Admin Plan page 11-11.

35. Once the WWHA determines that there was an overpayment of subsidy that must be reimbursed to the WWHA, the voucher recipient must reimburse the WWHA for the overpaid subsidy. The WWHA may terminate a voucher recipient only if the voucher recipient does not pay the overpaid subsidy. See WWHA Admin Plan at page 14-7. Nothing in the WWHA Admin Plan authorizes the WWHA to terminate a voucher recipient for failure to report a change in income on a timely basis if the failure to report does not result in an overpayment of subsidy.

36. Nothing in the WWHA Admin Plan requires business owners to report income from a business that is receiving no net income or negative net income. See e.g. WWHA Admin Plan page 6-13 ("If the net income from a business is negative, no business income will be included in annual income…");WWHA Admin Plan page 11-9 ("Families are not required to report any other changes in income or expenses.").

37. While a Section 8 Voucher can be terminated if the recipient commits fraud on the PHA, the "failure to report changes as required, such as failure to notify the PHA of a change in family composition or income" is clearly defined by HUD as an error or omission, not fraud. See HUD Housing Choice Voucher Guidebook at page 22-2.

38. HUD defines fraud as "a single act or pattern of actions made with the intent to deceive or mislead, constituting a false statement, omission, or concealment of a substantive fact." Further, to constitute fraud, the intentional act must "result in the payment of housing choice voucher program funds in violation of program requirements." See HUD Housing Choice Voucher Guidebook at page 22-1.

***The Plaintiff's Section 8 Voucher & WWHA's Most Recent Determination of Plaintiff's Rent***

39.   In 2003, the Plaintiff first received a Section 8 Voucher from the WWHA.

40.   Since 2003 and until the Defendants terminated the Plaintiff's Section 8 Voucher, the

       Plaintiff always paid his share of the rent to his landlords.

41.   Currently, the Plaintiff's only source of income is Supplemental Security Income from

       Social Security Administration in the amount of $905.00 per month, and he also receives

       Supplemental Nutrition Assistance Program (i.e. food stamp) benefits totaling $146.00

       per month.

42.   As a result of WWHA's most recent annual certification of Plaintiff's income, conducted

       in February, 2015, the Plaintiff's portion of the rent was $155.00 per month.

***The Plaintiff's food truck business***

43.   The Plaintiff has received income from the Social Security Administration on account of

       his disability since 2009. For the past several years, the Social Security Administration

       sent the Plaintiff letters that encouraged the Plaintiff to lawfully increase his income by

       working part time. Due to the encouragement from the SSA, in 2014, the Plaintiff

       determined that he could to obtain flexible part-time employment and supplement his

       income by starting a food truck business.

44.   In early 2014, the Plaintiff entered into an agreement with Dianne Cummiskey, whereby

       Cummiskey agreed to purchase a food truck and provide financing for start-up costs. The

       Plaintiff agreed to operate the food truck until the business income was sufficient to repay

       Cummiskey the entire amount of her investment. As soon as Cummiskey was reimbursed

       for her investment, the Plaintiff would assume ownership of the food truck business in its

       entirety and retain all future profits, if any.

45. On or about April 3, 2014, Cummiskey purchased a used food truck. The Plaintiff had to make repairs to and modify the interior of the food truck before it would suit his business needs. Cummiskey also provided Plaintiff with funds for initial start-up costs, to include licenses, food, equipment, and various other business expenses.

46. On February 6, 2015, during the Plaintiff's annual recertification process, to ensure that he would be in compliance with his obligations under the WWHA Admin Plan, the Plaintiff asked Patricia Raposa, a "Senior Housing Specialist" of the WWHA, when he needed to report his new business to WWHA.

47. Raposa stated that the Plaintiff needed to notify the WWHA once he started to earn income, which is consistent with the WWHA Admin Plan. See WWHA Admin Plan page 11-9 (requiring voucher recipients to report "all increases in earned income, including new employment, within 10 business days of the date the change takes effect.... Families are not required to report any other changes in income or expenses."); and page 6-12 (income includes "the net income from the operation of a business or profession").

48. In May 2015, the Plaintiff began operating the food truck business under the name "Sweet Daddy's Chicken" in and around West Warwick, Rhode Island, including on the street in front of his apartment.

49. Since starting the food truck business in May, 2015, the Plaintiff has not realized any net income from the operation of the food truck business. Therefore, according to HUD regulations, the WWHA Admin Plan and the statement by WWHA's representative, he was not under any obligation to report a change in his income to the WWHA at that time.

*Defendants' Discovery of Plaintiff's Food Truck Business and Subsequent Termination of*

*Plaintiff's Section 8 Voucher*

50. According to her testimony at the hearing WWHA held on July 30, 2015, which is described below, on June 17, 2015, Defendant Fagan received a phone call from an unidentified person who wanted to make unspecific allegations of fraud against the Plaintiff. Defendant Fagan refused to accept an anonymous complaint over the phone, but invited the caller to come to WWHA to make a complaint against the Plaintiff in person.

51. According to her testimony, on the same day, the caller came to the WWHA to speak with Defendant Fagan about the Plaintiff. The caller made unspecific and unsubstantiated accusations that the Plaintiff was committing fraud on the WWHA.

52. According to her testimony, on the same day, after receiving the anonymous complaint in person, Defendant Fagan called D&V MainSail and, on information and belief, spoke to either Defendant Overton or Defendant Leco and agreed on a plan to handle the unsubstantiated accusations that the Plaintiff was committing fraud on the WWHA.

53. Around 12:00pm on June 17, 2015, Defendant Fagan called the Plaintiff and asked him to come to the WWHA immediately. The Plaintiff informed the WWHA that he was busy at that moment, but would come down at 3:00 p.m.

54. At about 12:30 p.m., on June 17, 2015, Defendant Fagan and another employee of WWHA drove to the food truck where the Plaintiff was working, which was parked in West Warwick.

55. While at the food truck, in front of a customer and a neighbor, Defendant Fagan and the other employee of WWHA loudly and publicly accused the Plaintiff of committing fraud and threatened to have the Plaintiff put in jail unless he relinquished his Section 8

Voucher immediately. Defendant Fagan told the Plaintiff to come to WWHA's office immediately to discuss the matter.

56. The Plaintiff was scared by the Defendants' threats. After Defendant Fagan and the other WWHA employee left, he finished serving his customers, closed up the food truck, and went to the office of the WWHA at approximately 3 p.m.

57. While at the office of the WWHA, on June 17, 2015, the Defendants did not provide the Plaintiff with a written notice explaining the allegations against him, did not reveal to the Plaintiff any of the evidence against him, did not inform the Plaintiff of his right to a hearing to contest the allegations or to present contrary evidence, and did not inform the Plaintiff of his right to be represented by counsel.

58. Instead, Defendant Fagan and the other employee of the WWHA verbally threatened the Plaintiff with criminal prosecution for fraud and that he would go to jail unless he wrote a letter immediately voluntarily relinquishing his Section 8 Voucher.

59. The Plaintiff responded by informing Defendant Fagan and the other employee of the WWHA that the food truck business was operating at a substantial loss and that he was not earning any net income.

60. Defendant Fagan and the other employee of the WWHA reiterated their demand that the Plaintiff write a letter immediately relinquishing his voucher or he would be criminally prosecuted for fraud and would go to jail.

61. Because he was scared of the Defendants' threats, the Plaintiff complied with the Defendants' demand and wrote a letter (attached as Exhibit A) relinquishing his voucher.

62. On June 19, 2015, the Plaintiff sent a letter to the Defendants (attached as Exhibit B), revoking his prior letter to voluntarily relinquish his voucher. In the letter, he requested a hearing to challenge the termination of his voucher.

63. On June 22, 2015, the Defendants sent the Plaintiff a letter (attached as Exhibit C) terminating his voucher as of July 31, 2015. The basis of the termination was "you have earned income that you knowingly did not report to this office, income from Sweet Daddy's Chicken." The termination letter does not accuse the Plaintiff of fraud or state that fraud was the reason for the proposed termination.

64. On June 25, 2015, the Plaintiff sent the Defendants a second letter (attached as Exhibit D) requesting an informal hearing to contest the proposed termination of his Section 8 Voucher.

65. On July 9, 2015, the Defendants scheduled the hearing for July 16, 2015, which was later rescheduled for July 30, 2015.

*The evidence at the hearing on July 30, 2015*

66. The WWHA Admin Plan and HUD Regulations require the Defendants to select a hearing officer who is impartial and is not "a person who made or approved the decision under review or a subordinate of this person." 24 C.F.R. § 982.555 (e)(4)(i).

67. The Defendants selected a hearing officer named Daniel Ouellette, who is currently the executive director of the North Attleborough Housing Authority. Defendant Leco, one of D&V/MainSail's partners, is a member of the board of commissioners of the North Attleborough Housing Authority. Thus, Daniel Ouellette is a subordinate of D&V/Mainsail, which is WWHA's executive director. Moreover, less than a year prior to

13

the hearing, D&V/MainSail conducted the search that selected Daniel Ouellette as the executive director of the North Attleborough Housing Authority.

68. The Plaintiff, through counsel, objected to the choice of Daniel Ouellette as hearing officer, due to his relationship to Defendant Leco and D&V/MainSail, whose decision was under review.

69. Daniel Ouellette initially closed his notebook and prepared not to hold the hearing; however, after Defendant Fagan objected, Daniel Ouellette agreed to hold the hearing.

70. Prior to taking evidence, Daniel Ouellette stated that he had reviewed WWHA's file regarding the Plaintiff and had already seen sufficient evidence to decide that the Plaintiff had earned income that he had failed to report to the WWHA.

71. At the hearing, Defendant Fagan and another employee of the WWHA testified that on June 17, 2015, they had each observed the Plaintiff working at the food truck business and conducting a sale. However, the Defendants presented no evidence that the Plaintiff had received any income, had failed to report income, or had made any fraudulent statement. The Defendants provided no evidence concerning the amount of income the Plaintiff had received and the amount of subsidy, if any, that the Defendants had overpaid on the Plaintiff's behalf.

72. The Plaintiff and Cummiskey testified and provided profit and loss sheets which demonstrated that the business had received no net income in the three months it had been in operation, and that the business was operating at a loss. All gross income that the business had received was used to pay for the expenses of the business, the latter of which exceeded the former.

73. On August 10, 2015, Daniel Ouellette issued a decision (attached as Exhibit E), which noted that "the evidence against [the Plaintiff] was minimal." The decision failed to identify any income that the Plaintiff received but failed to report to the WWHA. Rather, the decision states that the Plaintiff "was not paid anything" from the food truck business, which was "confirmed by the business owner … who also claims to have no profit in the business."

74. Despite concluding that the Plaintiff had not received income, Daniel Ouellette upheld WWHA's termination of the Plaintiff's Section 8 Voucher. The decision states, without explanation, that "WWHA collected sufficient evidence to meet the criteria 'Preponderance of evidence' and reach the conclusion of fraudulent income."

75. Daniel Ouellette appears to have based his conclusion of "fraudulent income" on evidence that the Plaintiff failed to report "when he started the business." However, nothing in the WWHA Admin Plan or HUD Regulations requires a voucher recipient to report when a voucher recipient starts a business. Daniel Ouellette's conclusion, therefore, was not based on the WWHA Admin Plan, which only requires a voucher recipient to report new income within ten days of receiving it, including net income from a business.

76. The hearing officer's conclusion of "fraudulent income" is not supported by the evidence presented at the hearing, and is not consistent with the basis for the proposed termination as stated in the notice of termination ("earned income you knowingly did not report to WWHA]").

77. Even if the food truck business generated income for the Plaintiff, which it did not, Plaintiff was entitled, as a person with disabilities who was previously unemployed, to

have that income disregarded for purposes of calculating his rent for the first twelve months of receiving that income. See 24 C.F.R. 5.617.

78. Even though there was no evidence of fraud and no evidence or determination of an overpayment of subsidy assistance by WWHA, the Defendants referred the Plaintiff to HUD Office of the Inspector General and to the state of Rhode Island Department of Human Services for investigations of fraud. These referrals violate the WWHA Admin Plan, which provides that the WWHA will only refer a voucher recipient for criminal prosecution if the amount of overpaid subsidy meets or exceeds the threshold for prosecution. WWHA Admin Plan at page 14-11 These referrals were also made in retaliation against the Plaintiff for his exercising his rights to receive a notice of termination and a hearing to contest the termination, which rights are protected by the Due Process Clause of the Fourteenth Amendment, by HUD regulations governing the HCVP, and by the WWHA Admin Plan.

79. Upon information and belief, neither HUD OIG nor the state of Rhode Island Department of Human Services has conducted an investigation into the Plaintiff for fraud.

## COUNT ONE: VIOLATION OF HUD REGULATIONS

80. The Plaintiff re-alleges and incorporates by reference herein paragraphs 1-78 above.

81. The Defendants may not terminate the Plaintiff's Voucher without complying with the procedural and substantive rules for termination of said benefits required by HUD regulations codified at 24 C.F.R. § 982.552, § 982.555, and the Defendants' Administrative Plan. See 24 C.F.R. § 982.54.

82. The Defendants' termination of the Plaintiff's voucher violated the WWHA Admin Plan, and therefore violated 24 C.F.R. § 982.54, in the following ways:

a.   The Defendants coerced the Plaintiff to relinquish his voucher under threat of criminal prosecution, which is not permitted by the WWHA Admin Plan;

b.   The Defendants coerced the Plaintiff to relinquish his voucher without providing him with a notice of termination, in violation of the WWHA Admin Plan at 12-14;

c.   The Defendants failed to accept the Plaintiff's self-certification of business income on June 17, 2015, as required by WWHA Admin Plan at pages 7-16 to 7-17;

d.   The Defendants failed to accept the Plaintiff's self-certification of business income on July 30, 2015, as required by WWHA Admin Plan at pages 7-16 to 7-17;

e.   The Defendants counted income from the Plaintiff's business, even though the business was operating at a loss and had no income, in violation of the WWHA Admin Plan at 6-13;

f.   The Defendants refused to follow the definitions of income and business income in the WWHA Admin Plan at page 6-12;

g.   The Defendants failed to investigate an accusation of fraud in accordance with WWHA Admin Plan at page 11-9;

h.   The Defendants failed to conduct an interim recertification of income as required by WWHA Admin Plan at page 11-9;

i.   The Defendants terminated the Plaintiff's voucher for failure to report changes in income without determining that an overpayment of subsidy assistance had

occurred and without determining the amount of overpayment of subsidy, in violation of the WWHA Admin Plan at pages 14-7;

j.  The Defendants terminated the Plaintiff's voucher using the pretext of fraudulent income because their plan to force the Plaintiff to relinquish his voucher under threat of criminal prosecution failed;

k.  The Defendants failed to consider alternatives to termination, in violation of the WWHA Admin Plan at pages 12-7 to 12-10;

l.  The Defendants failed to permit the Plaintiff to repay any overpayment of subsidy assistance prior to termination, as required by WWHA Admin Plan at pages 11-11; 14-6 to 14-7; 16-22.

m.  The Defendants failed to consider the Plaintiff for a repayment plan prior to termination, as required by WWHA Admin Plan at pages 11-11; 16-22.

n.  The Defendants failed to provide a hearing officer that is a person other than a person who made or approved the decision under review or a subordinate of this person, as required by WWHA Admin Plan at pages 16-13;

o.  The hearing officer failed to render a decision based on the legal rules and evidence, as required by WWHA Admin Plan at pages 16-15;

p.  The hearing officer failed to render a decision based on the preponderance of the evidence, as required by WWHA Admin Plan at pages 12-10; 16-15 to 16-16;

q.  The hearing officer's decision was not based on the reasons stated in the notice of termination, as required by WWHA Admin Plan at pages 16-15 to 16-16.

r.  The hearing officer failed to consider mitigating circumstances, as required by WWHA Admin Plan at page 12-10, including the amount of net income (which is

negative), the disregard of any income to the Plaintiff under 24 C.F.R. § 5.617, and the eligibility of the Plaintiff for a repayment plan under WWHA Admin Plan pages 11-11, 16-22.

83. The Defendants' decision to terminate the Plaintiff's voucher failed to comply with the requirements of the HUD Regulations governing section 8 voucher terminations (24 C.F.R. § 982.555) in one or more of the following ways:

   a. The Defendants coerced the Plaintiff to relinquish his voucher without providing him a written notice of termination and an opportunity to request a hearing;

   b. The Defendants failed to provide written notice to the Plaintiff concerning its determination of annual or adjusted income and the use of such income to compute the housing assistance payment;

   c. The Defendants failed to provide written notice that the Plaintiff may request an informal hearing on the decision to terminate assistance until after Plaintiff rescinded the relinquishment of his Section 8 Voucher;

   d. The Defendants failed to conduct a hearing in accordance with the procedures in the WWHA Admin Plan;

   e. The Defendants selected a hearing officer who was a subordinate of the person who made or approved the decision under review;

   f. The Defendants followed the hearing officer's decision even though it was not based on a preponderance of the evidence presented at the hearing;

   g. The Defendants followed the hearing officer's decision even though it was contrary to HUD regulations and the WWHA Admin Plan;

    h.   The Defendants failed to follow HUD's definition of business income as set forth in 24 C.F.R. § 5.609; and

    i.   The Defendants violated the Self Sufficiency Incentives program as set forth in 24 C.F.R. 5.617, which disregards the first twelve months of employment income for a person with disabilities who was previously unemployed.

84.   In terminating the Plaintiff's Voucher without complying with 24 C.F.R. §§ 982.54 and 982.555, the Defendants deprived the Plaintiff of rights secured by the laws of the United States under color of State law, which is actionable pursuant to 42 U.S.C. § 1983.

85.   The Plaintiff has suffered damages, including the termination of his voucher, lost business opportunities, loss of reputation and standing, humiliation, mental anguish, anxiety, depression, and emotional distress.

## COUNT TWO: THE DEFENDANTS' TERMINATION OF THE PLAINTIFF'S VOUCHER VIOLATES THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION

86.   The Plaintiff re-alleges and incorporates by reference herein paragraphs 1-84 above.

87.   The Plaintiff has a constitutionally protected property interest in his Voucher and the continued receipt of Voucher assistance, which may not be terminated except upon procedures comporting with the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States.

88.   The Defendants violated the Plaintiff's Due Process rights secured by the Fourteenth Amendment of the Constitution of the United States in one or more of the following ways:

    a.   The Defendants failed to provide a hearing before an impartial hearing officer;

b. The Defendants failed to provide proper notice of the termination to the Plaintiff;

c. The hearing officer's decision was not based solely on the legal rules and evidence adduced at the hearing;

d. The hearing officer's decision was not based on a preponderance of the evidence; and

e. The hearing officer's decision was not based on the reasons stated in the notice of termination.

89. The Defendants' violation of the Plaintiff's Due Process rights under the Fourteenth Amendment to the United States Constitution deprived the Plaintiff of rights secured by the laws of the United States under color of State law, which is actionable pursuant to 42 U.S.C. § 1983.

90. The Plaintiff has suffered damages, including the termination of his voucher, lost business opportunities, loss of reputation and standing, humiliation, mental anguish, anxiety, depression, and emotional distress.

**COUNT THREE: CONSPIRACY TO DEPRIVE ANOTHER OF CIVIL RIGHTS**

91. The Plaintiff re-alleges and incorporates by reference herein paragraphs 1-89 above.

92. The Defendants conspired together and committed actions in furtherance of the conspiracy, to injure the Plaintiff in his person or property, or to deprive the Plaintiff of having and exercising any right or privilege of a citizen of the United States, including his Section 8 Voucher.

93. The Plaintiff has an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators, pursuant to 42 U.S.C. § 1985 (3).

## COUNT FOUR: VIOLATION OF TITLE VI OF THE 1964 CIVIL RIGHTS ACT

94.   The Plaintiff re-alleges and incorporates by reference herein paragraphs 1-92 above.

95.   The Plaintiff is a member of a protected class in that he is black.

96.   The Defendants are recipients of federal funds from HUD.

97.   The Defendants coerced the Plaintiff to relinquish his Section 8 Voucher under threat of criminal prosecution because the Plaintiff is black.

98.   The Defendants terminated the Plaintiff's Section 8 Voucher under the pretext of Plaintiff's not reporting income, when Plaintiff had no income to report, because Plaintiff is black.

99.   Ninety-five percent of the recipients of Section 8 Vouchers from the WWHA and one hundred percent of the residents in public housing managed by WWHA are white. Four percent of the Section 8 Voucher recipients are black and none of the residents of WWHA's public housing facilities are black.

100.   On information and belief, the Defendants treat similarly situated white participants in the Section 8 Voucher program differently from the way they treated the Plaintiff, because the Plaintiff is black.

101.   The Defendants violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, by intentionally discriminating against the Plaintiff on the basis of race by requiring the Plaintiff to voluntarily relinquish his voucher under threat of criminal prosecution and by terminating his voucher in violation of HUD regulations and the WWHA Admin Plan.

102.   As a result of the Defendants' discrimination, the Plaintiff suffered damages, including the termination of his voucher, lost business opportunities, loss of reputation and standing, humiliation, mental anguish, anxiety, depression, and emotional distress.

103. An implied private cause of action exists for injunctive and compensatory relief for the violations of 42 U.S.C. § 2000d.

## COUNT FIVE: VIOLATION OF THE FAIR HOUSING ACT

104. The Plaintiff re-alleges and incorporates by reference herein paragraphs 1-102 above.

105. The Defendants violated the Fair Housing Act, 42 U.S.C. § 3604(f)(2) by discriminating in the terms, conditions and privileges of the rental of the Plaintiff's dwelling on the basis of race.

106. The Plaintiff suffered damages as a result of the Defendants' violations of the Fair Housing Act, including the termination of his voucher, lost business opportunities, loss of reputation and standing, humiliation, mental anguish, anxiety, depression, and emotional distress.

107. The Defendants' violations of the Fair Housing Act are actionable pursuant to 42 U.S.C. § 3613.

## COUNT SIX: DEFAMATION

108. The Plaintiff re-alleges and incorporates by reference herein paragraphs 1-106 above.

109. On June 17, 2015, Ms. Fagan and another employee of WWHA, on behalf of all Defendants, approached the Plaintiff at the food truck, and made false and defamatory statements against the Plaintiff, claiming that he was committing fraud and would go to jail unless he relinquished his voucher immediately.

110. Ms. Fagan made the statements against the Plaintiff loudly and publicly at the food truck on the streets of West Warwick and in front of other customers, including the Plaintiff's next door neighbor.

111. The statements of Ms. Fagan and the other employee of WWHA, on behalf of all Defendants, were false. The Plaintiff never committed fraud on the WWHA as he has never made a false statement concerning his income and he has not earned any income from the business.

112. The statements of Ms. Fagan and the other employee of WWHA, on behalf of all Defendants, were made with at least negligent intent. The Defendants failed to consult HUD Regulations, the HUD Housing Choice Voucher Guidebook, or the WWHA Admin Plan for the proper procedures to investigate allegations of fraud, failed to follow their own procedures, and failed to conduct an investigation.

113. The statements of Ms. Fagan and the other employee of WWHA, on behalf of all Defendants, defamed the Plaintiff by accusing him of a criminal offense and of fraud, which is a matter incompatible with his business, trade, profession, or office.

114. As a proximate result of the defamation, Plaintiff suffered damages, including the termination of his voucher, lost business opportunities, loss of reputation and standing, humiliation, mental anguish, anxiety, depression, and emotional distress.

## COUNT SEVEN: EXTORTION

115. The Plaintiff re-alleges and incorporates by reference herein paragraphs 1-113 above.

116. On June 17, 2015, Fagan and another employee of the WWHA, on behalf of all Defendants, threatened that the Plaintiff would be prosecuted for fraud and would go to jail unless he wrote a letter voluntarily relinquishing his voucher.

117. The Plaintiff did not want to voluntarily relinquish his voucher.

118. As a direct result of the Defendants' threats, the Plaintiff did in fact relinquish his voucher.

119. Defendants' actions constitute extortion.

120. As a direct and proximate result of Defendants' extortion, the Plaintiff suffered damages, including the termination of his voucher, lost business opportunities, loss of reputation and standing, humiliation, mental anguish, anxiety, depression, and emotional distress.

**WHEREFORE**, The Plaintiff demands a trial by jury, and asks this Honorable Court to award the following relief:

1. Declare that the Defendants' termination of the Plaintiff's Voucher violated 24 C.F.R. §§ 982.54, 982.552, and 982.555;

2. Declare that the Defendants' termination of the Plaintiff's Voucher violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution;

3. Declare that the Defendants intentionally discriminated against the Plaintiff on account of his race in violation of Title VI of the Civil Rights Act of 1964;

4. Declare that the Defendants discriminated against the Plaintiff on account of his race in violation of the Fair Housing Act;

5. Declare that the statements the Defendants made publicly against the Plaintiff on June 17, 2015, namely that he was committing fraud, were false;

6. Declare that the Plaintiff has not received income from the food truck business as the term income is defined in the WWHA Admin Plan and in 24 C.F.R. § 5.609, and that the Plaintiff never failed to report increases in income to WWHA.

7. Issue preliminary and permanent injunctive relief enjoining the Defendants to:

   a.) reinstate, forthwith, the Plaintiff's Voucher;

b.) resume making rental subsidy payments to the Plaintiff's landlord, and pay the Plaintiff's landlord any subsidy payments withheld subsequent to the termination of the Plaintiff's Voucher; and

c.) reimburse Plaintiff for the sums he expended to pay the full contract rent for the months subsequent to Defendants' termination of Plaintiff's Voucher;

8. Award the Plaintiff compensatory damages pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 3613;

9. Award the Plaintiff punitive damages pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 3613;

10. Award the Plaintiff compensatory and punitive damages for extortion and/or defamation;

11. Award the Plaintiff his attorney's fees, expert fees, and costs pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 3613; and

12. Grant such other and further relief to the Plaintiff as may be just and equitable under the circumstances.

Leveland Brown
By his attorneys,


/s/ Jeffrey C. Ankrom
Jeffrey C. Ankrom, Esq. #7663
Rhode Island Legal Services, Inc.
56 Pine St., Fourth Floor
Providence, RI 02903
(401) 274-2652 ext.138
(401) 453-0310 fax
jankrom@rils.org


/s/ Eric Bither
Eric Bither, Esq. (#8910)
Rhode Island Legal Services, Inc.
56 Pine St., Fourth Floor
Providence, RI 02903
(401) 274-2652 ext.141
(401) 453-0310 fax
ebither@rils.org


/s/ Steven Fischbach
Steven Fischbach, Esq. (#3259)
Rhode Island Legal Services, Inc.
56 Pine St., Fourth Floor
Providence, RI 02903
(401) 274-2652 ext.182
(401) 453-0310 fax
sfischbach@rils.org

## VERIFICATION OF COMPLAINT

I, Leveland Brown, state the facts set forth in the foregoing Verified Complaint are true and accurate to the best of my knowledge and that I am signing this document knowingly and voluntarily.

_____          10-16-15
Leveland Brown                            Date

State of Rhode Island
County of Providence

On this 16th day of October, 2015, before me personally appeared Leveland Brown, proved through satisfactory evidence of identification which was _driver's license_, and after he was duly sworn he declared and acknowledged to me that the facts set forth in the within Verified Complaint were true to the best of his knowledge and that he signed the above Verification of Complaint knowingly and voluntarily.

_____
Notary Public: Jeffrey C. Ankrom
My Commission Expires: June 11, 2016
Notary I.D. #62716

28